**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | | |
|---|---|---|
| DARRYL J. BEATTY, | : | |
| Claimant, | : | |
| v. | : | CASE NO. 7:07-CV-141 (WLS) |
| | : | Social Security Appeal |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| Respondent. | : | |

**REPORT AND RECOMMENDATION**

The Social Security Commissioner, by adoption of the Administrative Law Judge's determination, denied Claimant's application for social security disability benefits, finding that he was not disabled within the meaning of the Social Security Act and Regulations. Claimant contends that the Commissioner's decision was in error, and he seeks review under the relevant provisions of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383©. All administrative remedies have been exhausted.

**LEGAL STANDARDS**

The court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). The court's role in reviewing claims brought under the Social

Security Act is a narrow one. The court may not decide facts, reweigh evidence, nor substitute its judgment for that of the Commissioner.[1] *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). It must, however, decide if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). The court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth v. Heckler*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, it must be affirmed if substantial evidence supports it. *Id.* The initial burden of establishing disability is on the claimant. *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973). The claimant's burden is a heavy one and is so stringent that it has been described as bordering on the unrealistic. *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

A claimant seeking Social Security disability benefits must demonstrate that he suffers from an impairment that prevents him from engaging in any substantial gainful activity for a twelve-month period. 42 U.S.C. § 423(d)(1). In addition to meeting the requirements of these statutes, in order to be eligible for disability payments, a claimant must meet the requirements of the Commissioner's regulations promulgated pursuant to the authority given in the Social Security Act. 20 C.F.R. § 404.1 et seq.

Under the regulations, the Commissioner determines if a claimant is disabled by a

---

[1] Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). See also *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986).

five-step procedure. 20 C.F.R. § 404.1520, Appendix 1, Part 404. First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Next, the Commissioner determines whether the claimant's impairment(s) meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past work. Finally, the Commissioner determines whether the claimant's residual functional capacity, age, education, and past work experience prevent the performance of any other work. In arriving at a decision, the Commissioner must consider the combined effect of all the alleged impairments, without regard to whether each, if considered separately, would be disabling. *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). The Commissioner's failure to apply correct legal standards to the evidence is grounds for reversal. *Id.*

## ISSUES

**I.     Whether the ALJ failed to properly assess Claimant's Residual Functional Capacity?**

**II.    Whether the ALJ failed to make proper determinations at Step Five of the sequential evaluation process?**

## Administrative Proceedings

Claimant protectively filed an application for supplemental security income on January 6, 2003. (T-11). Claimant's application was denied initially and on reconsideration. *Id*. Claimant then filed a request for a hearing before an administrative law judge (ALJ), which was held on March 24, 2006. (T-654-683). Subsequent to the hearing, the ALJ found that the Claimant was not disabled in a decision dated September 13, 2006. (T-9-20). Claimant then requested a review of the ALJ's findings by the Appeals Council. Thereafter, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (T-4-7).

**Statement of Facts and Evidence**

Claimant alleged in his disability application that he was disabled due to a heart attack and wet lung. (T-78). After examining the medical records, the ALJ determined that Claimant had "coronary artery disease (history of old heart attack), chronic obstructive pulmonary disease (from ongoing tobacco abuse), a history of alcoholism (still drinking some now), and histories of alcoholic seizures, hepatitis, and alcoholic radiculopathy," impairments that were severe within the meaning of the Regulations but not severe enough to meet, or medically equal, any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (T-13-15). Thereafter, the ALJ found that Claimant would not be able to return to his past relevant work but Claimant had the residual functional capacity to perform light exertional work with some nonexertional limitations. (T-15-18). After consulting a Vocational Expert, the ALJ found that there were number of jobs available in significant numbers which Claimant could perform. (T-19). As such, the ALJ found that

4

Claimant was not disabled. (T-20).

## DISCUSSION

**I.  Whether the ALJ failed to properly assess Claimant's Residual Functional Capacity?**

Claimant argues that the ALJ failed to comply with the regulations in evaluating Claimant's intellectual impairments. (R-12, p. 15). Claimant argues that the ALJ ignored evidence of Claimant's mental retardation/borderline intellectual functioning, including evidence of IQ scores that were consistent from the time Claimant was 12 (before he began drinking heavily) through testing in 2001 and 2003. (R-15).

It should be noted here that the Eleventh Circuit has held that the ALJ is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. Test results of this sort should be examined "in conjunction with other medical evidence and the claimant's daily activities and behavior." *Popp v. Heckler*, 779 F.2d 1497, 1500 (11th Cir. 1986). Furthermore, *Lowery v. Sullivan* held that a valid IQ score is not conclusive of mental retardation if the score is not consistent with other evidence of record. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992).

The ALJ did note some of Claimant's IQ scores in his Findings. In such, the ALJ stated:

> Claimant has alleged mental retardation. Contrary to his allegations, at age 12 he obtained a Verbal IQ score of 85, a Performance IQ score of 60 and a <u>Full-scale IQ of 70</u> (Exhibit 10E/2). At age 17, he obtained a Verbal IQ of 85, a Performance IQ of 75 and a <u>Full-scale IQ of 80</u>. (Exhibit

5

> 11E/1). He also reported going to school until the 10th grade at
> age 16 (Exhibit 8E/1).

(T-14-15) (emphasis in the original). It appears that the ALJ emphasized the full-scale IQ scores on both sets of Wechsler tests to indicate that Claimant did not test as mentally retarded. However, the Commissioner's own guidelines require that "where more than one than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the **lowest** of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C(6). (emphasis added). According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision published in 2000 (DSM-IV-TR), an IQ level of 50-55 to approximately 70, would place a person in the Mild Mental Retardation category. *DSM-IV-TR*, p. 42-43. Claimant's testing at age 12 then, using the Performance Score of 60 (T-133), the lowest of the scores, would have placed Claimant in the mild mental retardation category. The narrative, which accompanied the Wechsler results, stated that there was "evidence of a problem in neuro-physiological development." (T-133). Said narrative further stated:

> Such skills as writing and reading would certainly be difficult
> because of the inability to organize visually and to reproduce
> certain things because of his limited neuro-muscular control.
> This seems to be consistent with the report on the case study
> that he had a great deal of difficulty in copying and writing.

*Id*. This narrative indicates that the IQ scores were "considered valid and consistent with the developmental history and the degree of functional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C(6).

6

The lowest Wechsler score obtained when Claimant was 17, was his Performance IQ of 75. (T-134). An IQ score between 71 and 84 is associated with borderline intellectual functioning. *DSM-IV-TR*, p. 740. Claimant's Performance IQ obtained at the age of 17, therefore, would place Claimant in the Borderline Intellectual Functioning range of intelligence. *Id*.

On April of 1992, in a discharge summary from Southwestern State Hospital for alcohol treatment, Dr. Leonard H. Brennan, a staff psychiatrist, noted Claimant's difficulty remembering remote events and stated, "this may have been due to a lack of interest and IQ limitation. IQ was estimated as borderline or at most, low average." (T-621).

On November 27, 2000, when Claimant was forty-eight years old, Thomas Czerlinsky, Ph.D., performed a Psychological Consultative Examination of the Claimant. (T-645-649). On said date, Dr. Czerlinsky conducted Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) testing which indicated Claimant had a Verbal IQ of 76, a Performance IQ of 77, and a Full Scale IQ of 75. (T-647). Dr. Czerlinsky stated that Claimant's "overall scores place him in the Borderline range of intellectual functioning." *Id*. Dr. Czerlinsky noted that Claimant's Wide Range Achievement Test - 3 (WRAT- 3) scores, placed "him in the Deficient range in Reading and Math. Based upon the results of this instrument [Claimant] is performing at approximately third grade level in Reading and Arithmetic." (T-648). Dr. Czerlinsky stated that Claimant was focused and motivated throughout the assessment process, and "appeared to be trying to perform at his optimum level. *Id*. Based upon his observations, Dr. Czerlinsky stated that "the assessment results

7

are considered to be valid, and to accurately reflect [Claimant's] level of functioning." *Id*. Dr. Czerlinsky's Axis I diagnosis included alcohol dependence and his Axis II diagnosis included borderline intellectual functioning. *Id*. Although Claimant reported that he had reduced his alcohol use, Dr. Czerlinsky opined that Claimant would be unable to independently manage his own funds. (T-649).

A consultative psychological examination of Claimant was performed by Karl R. "Bob" Willers, Ph.D., on December 1, 2003. (T-481-486). In giving his history, Claimant admitted to drinking, but Dr. Willers believed that subsequent questions regarding such yielding answers that were either denial or diminishing the problem." (T-483). Dr. Willers did note that Claimant's records indicated an "intense episodic alcohol history, probably longstanding." *Id.* Although Claimant admitted to a history of DUI's, he denied ever having lost employment as a result of alcohol use. *Id*. Claimant stated that he last used alcohol three to four weeks before his evaluation with Dr. Willers. *Id*. When discussing Claimant's mental status, Dr. Willers stated:

> [Claimant's] eye contact is occasional during interview. It picked up somewhat during testing in an apparent effort to orient himself to subtest instructions. His speech was sparse, his thinking consistently concrete. I think [Claimant] gave reliable information in interview, as it is basically consistent with records received. However, he offered very little information about what appeared to be significant emotional, relational and physical problems in his past. His affect was somewhat flat, but it was hard to tell if he felt depressed. He didn't complain of that. Perhaps he didn't know how to complain of that. He did not demonstrate any unusual or bizarre behavior, but the overall quality of [Claimant's] functioning in interview and even more so in testing was exceptionally low.

8

> [Claimant] obtains 15 of 30 points on the Mini Mental State Exam. He claims not to know the date, states the year is "203." Answers to easy questions like that often came after a long pause, if at all. He does know county of residence. He appears to know purpose of meeting. He is able to name two of three common objects immediately, none of them incidentally a minute later. He is unable to spell world forward or backward. He cannot read simple phrases such as "Close your eyes." He is unable to write a complete sentence about himself, he can legibly print his name.

(T-484-485). Dr. Willers conducted Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) testing which indicated Claimant had a Verbal IQ of 49, a Performance IQ of 48, and a Full Scale IQ of 45. (T-485). In discussing the test results, Dr. Willers stated:

> The scores by themselves, suggest moderate levels of MR. The Full Scale IQ score of 45 is in the zero percentile and that score statistically is not expected to rise about 50.
>
> The general quality of this man's approach to testing did not altogether compare with some answers he gave to questions about functioning in interview. This is a man who said he could play Rummy and has played recently and has won. That may be a well established activity, but it is a task that contains some novelty. Judging from how he presents in testing, [Claimant] is hardly able to approach that kind of novelty. At some point, he presents a bit oppositional stating, "I don't see it like that," when I try to explain what he was to do on the similarities subtest (conceptual thinking). In addition, [Claimant] fumbled around with the block design task, could not even replicate a two block pattern. He is able to count objects at least up to three of them, but acts here like he is unable to count seven or eight objects. He is unable to perform single digit problems.
>
> . . . [Claimant's] Bender Gestalt is executed with quite a bit of effort. He does act like he is trying to compensate for poor functioning there such as by using test plates and guidelines to make lines straight. This Bender Gestalt would be categorized in the area of organic brain syndrome, gross and diffuse.

> Overall, [Claimant] presents in extremely poor health and also with traditionally low IQ and with some social isolation lately. There are reports of his activities recently that suggest somewhat higher functioning than what he presented here. I do not believe [Claimant] was intoxicated, but he might have been in some way influenced by substances. In addition, he demonstrated a flat affect and I suspect a depressed mood. The overall flatness of his presentation made it somewhat difficult to ascertain what his clinical status is beyond his rather amorphous presentation. He was polite and verbal on exit.

(T-485-486). Dr. Willers further opined that Claimant would need assistance with funds, if awarded. (T-486).

On January 6, 2004, Jill J. Rowan, Ph.D. completed a Psychiatric Review Technique (PRT) regarding Claimant. (T-496-509). On the very first page of the PRT, Dr. Rowan indicates that the medical disposition was based upon "12.09 Substance Addiction Disorders." (T-496). Dr. Rowan found that Claimant had only a mild degree of limitation in difficulties in maintaining concentration, persistence or pace, and that Claimant had no other functional limitations. (T-506). Dr. Rowan determined that Claimant's assessment by Dr. Willers in December of 2003, was not a valid representation of Claimant's abilities because said scores were inconsistent with Claimant's reported work history of thirty (30) years as a welder[2], and because "no observation was ever made [at] his hospitalizations of

---

[2] Throughout the record, mainly due to statements made by Claimant, it was reported that Claimant worked for thirty (30) years as a welder. Dr. Rowan and the ALJ both used this work history as evidence that Claimant was not as mentally limited as alleged (T-15 and 508-509). Though such may not have been available to Dr. Rowan, it should be noted that the ALJ had access to Claimant's history of earnings (T-59). Said earnings indicate that although Claimant may have worked on and off throughout the years, Claimant had only engaged in substantial gainful activity (whether as a welder, or otherwise), once (1989), since 1979. (T-59); See 20 C.F.R. 404.1574(b)(2)(i) and Table 1.

such reduced intellectual abilities." (T-508-509). Dr. Rowan found that the primary issue in this examination was Claimant's alcohol abuse. (T-508). The front page of the PRT also contains a note from John W. Hollender, Ph.D. on April 7, 2004, which states, "I have reviewed the evidence in the file and the assessment of 1/6/04 is affirmed as written." (T-496).

Dr. Rowan noted that there was evidence in the record that Claimant attended special education classes. (T-508). The medical record also indicates that Claimant performed in the Borderline Intellectual Functioning range in his 2000 consultative evaluation with Dr. Czerlinsky (T-645-649), which presumably would have been included in the medical evidence presented to Dr. Rowan and Dr. Hollender as it was completed at the request of the Social Security Administration. Despite the medical evidence of possible borderline intellectual functioning and a traumatic head injury and/or stroke, Claimant was neither evaluated under Listing 12.02 or 12.05.

Although such evidence may not have been available to Drs. Rowan and Hollender during their reviews in 2004, by the time the administrative hearing was held, there was ample evidence before the ALJ that Claimant attended special education classes and that Claimant had consistently tested in the borderline intellectual functioning range or lower. (T-83, 109, 112, 119-121, 123-125, 132-135, 621, 645-649). There was also testimony and reports by Claimant throughout his medical records of a traumatic head injury and/ or a stroke (T-67, 139, 460, 483, 613, 618, 624, 630 and 673), and Dr. Willers believed that Claimant had some sort of organic brain syndrome (T-595). It should be noted that there is

11

evidence in the record dating back to 1964 and 1969 that demonstrates Claimant's difficulty with comprehension, copying and writing, and memory. (T-119-120, 123-124, 132-133). At age 12, Claimant was evidencing difficulty with tasks that "required visual organization, vision perception, and neuro-muscular control," which the state examiner believed evidenced a problem with "neuro-physiological development." (T-133).

Though Dr. Rowan and Dr. Hollender may not have had sufficient information before them to necessitate the evaluation of Claimant under Listings 12.02 or 12.05 in early 2004, by September 13, 2006, the ALJ certainly did. Given the additional evidence in the record available to the ALJ by 2006 of Claimant's possible borderline intellectual functioning/ mental retardation, traumatic head injury and/or stroke, and possible "organic brain syndrome," it was improper for the ALJ to rely on the DAS determination from 2004. (T-496-509). The record also contains several notations of Depression, including a suicide attempt, that may or may not be related to Claimant's alcohol abuse. (T-366, 608-612, 614, 618-619, 621, 635, 637, 638, 643, and 648). Therefore, it is recommended that this case be remanded for Claimant to be reevaluated for any mental limitations, including, but not limited to evaluation under Listing Sections 12.02, 12.04 and 12.05.

### Alcohol Abuse

In addition, the ALJ noted, and this court recognizes, a history of alcohol abuse and a possible current issue of alcohol abuse. In his consultative evaluation with Thomas Czerlinsky, Ph.D., on December 19, 2000, Claimant reported: that he'd been arrested for public intoxication approximately ten times; had three DUIs; been in detox centers too many

times to count; attended two 28-day treatment programs; and had short terms of employment partly due to his alcohol abuse. (T-646). In a January 2001, psychiatric evaluation for purposes of admission and treatment, Dr. A. Kenneth Fuller noted that Claimant:

> [W]as evaluated at the Crisis Unit by Dr. Hidalgo and sent on a 2013 which states, "Drinking one half gallon daily. Blood alcohol level 0.28 at present. 'I will blow my brains out.' Drinking heavily daily." . . . [H]as a history of arrests for public drunkenness or disturbance related to drinking. He has had five DUI's. . . .He has had fourteen prior admissions to Southwestern State Hospital, The most recent[] admission was November 15-18, 1998 for Depressive Disorder, NOS and Alcohol Intoxication. . . . His first admission to Southwestern State Hospital was in 1978. He has been in detox centers several times.

(T-608-609). Dr. Fuller noted that Claimant was in special education classes from the sixth grade until the tenth grade, when Claimant quit school. (T-609). Dr. Fuller also noted that Claimant's drinking had interfered with his ability to work, stating "[h]e has had several jobs and was fired five or six times because of the alcohol abuse." *Id*. The interference of alcohol with Claimant's ability to work was noted in Claimant's discharge summary from Southwestern State Hospital on November 18, 1998 (T-614-615), his Psychological Assessment Update from the same admittance (T-619), and a discharge summary from April 1992 (T-623). The record also contains evidence of several other admissions to Southwestern State Hospital for alcohol dependence, as follows: in April 1985 (T-626); May 1984 (T-627-628); March 1983 (T-629); June 1980 (T-630); December 1979 (T-635); September 1979 (T-639); February 13th through March 9th, 1979 (T-632); January 27th, through February 1st, 1979 (T-637); and dates in November and December of 1978 (T-641-

13

644).

The Social Security Act precludes the award of benefits to an individual "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)©), 1382c(a)(3)(J); 20 C.F.R. §416.935; *Doughty v. Apfel*, 245 F.3d 1274 (11th Cir. 2001). Therefore, this Court also recommends that upon remand that the ALJ evaluate Claimant's disability in accordance with 42 U.S.C. §§ 423(d)(2)©), 1382c(a)(3)(J) and 20 C.F.R. §416.935 to determine if drug and alcohol abuse would have been a contributing factor to Claimant's issue of disability on his date last insured.

As to the whether proper determinations were made at Step Five, it was not necessary to consider said evidence during this court's review as the above discussed issue begs for a remand. If after reevaluation, Step Five is reached, the ALJ should follow the proper procedures and inquire of the VE if any named positions are inconsistent with information contained in the DOT.

## CONCLUSION

In reviewing the record, error is found which substantiates Claimant's contentions that the ALJ improperly assessed Claimant's residual functional capacity. The decision of the Commissioner was not supported by substantial evidence.

**WHEREFORE**, **IT IS RECOMMENDED** to the United States District Judge that the decision of the defendant Commissioner of Social Security be **REMANDED**.

Pursuant to 28 U.S.C. § 636(b)(1), Claimant may serve and file written objections to this recommendation with the UNITED STATES DISTRICT JUDGE within ten (10) days after being served a copy of this recommendation.

THIS the 28th day of July, 2008.

S/ G. MALLON FAIRCLOTH<br>UNITED STATES MAGISTRATE JUDGE

mZc